Frances M. Green (FG-8035)
fgreen@ebglaw.com
Brian G. Cesaratto  (BC-5464)
bcesaratto@ebglaw.com
Brian M. Molinari  (BM-7836)
bmolinari@ebglaw.com
Epstein Becker Green P.C.
250 Park Avenue
New York, New York  10177
(212) 351-4500
Attorneys for Plaintiffs

RECEIVED

MAY 1 2 2008

U.S.D.C. S.D. N.Y.
CASHIERS

JUDGE HOLWELL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE COLLEGE OF MOUNT SAINT VINCENT and
CHARLES L. FLYNN, JR., Ph.D,

08 CIV 4418

                              Plaintiffs,

            - against -

**COMPLAINT**

ADELE GATENS, KELLY MEADE, CHRISTINA
TRINIDAD-ENAYE, ESPERANZA BORRERO-
LARGE, and DOES 1 through 4,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs THE COLLEGE OF MOUNT SAINT VINCENT (the "College" or "CMSV")

and CHARLES L. FLYNN, JR., Ph.D ("Dr. Flynn") (collectively, "Plaintiffs") by their

attorneys, Epstein Becker Green, P.C., as and for their Complaint against ADELE GATENS

("Gatens"), KELLY MEADE ("Meade"), CHRISTINA TRINIDAD-ENAYE ("Trinidad-

Enaye"), ESPERANZA BORRERO-LARGE ("Borrero-Large"), and DOES 1 through 4

(collectively, "Defendants") allege as follows:

## NATURE OF THE ACTION

1.     This action responds to Defendants' ongoing tortious campaign intended to harm the significant financial interests and reputations of the College and Dr. Flynn, the College's President, and exact retribution and a pecuniary resolution of Defendant Gatens' spurious claims of employment discrimination and wrongful termination.  Plaintiffs hereby seek to immediately bring to an end the mounting damage caused by Defendants' vindictive and malicious actions begun immediately after Gatens was lawfully terminated on March 19, 2008 from her position as Vice President of Student Affairs for insubordination and upon the discovery that Gatens had breached her fiduciary duty to the College, inter alia, by creating a false "memo" regarding the performance of her friend and subordinate Cathy Ingram, and duplicitously leading the College's Director of Human Resources, William Bechman, to believe that Dr. Flynn, the addressee, had actually received the memorandum, when he had not. Instead, Gatens instructed Bechman to insert the false memorandum in the College's personnel records with the intent to justify Gatens' insubordination and to cause future harm to Plaintiffs.

2.     Defendants and unknown others acting in concert with them, thereafter targeted the College's financial and business relationships with its alumni, financial donors, employees, and current and prospective students by publishing false statements designed to injure Plaintiffs' reputations, and to interfere with their economic relationships all with the intent to diminish alumni financial contributions, student enrollment, the College's academic prestige, and public support to the College, on which it depends.  Defendants' public campaign included mass emailing and distribution of pamphlets to alumni maligning Dr. Flynn in his profession, reputation, character and integrity, and issuing an immediate call to action to reduce donations to the College.  Simultaneously with Defendants' specious and scandalous ongoing attacks, Defendant Gatens retained counsel and sought monetary payments and other benefits to abate

2

her threatened, but wholly frivolous claims. Following her termination, Defendant Gatens has also retained and duplicated without authorization or permission thousands of the College's computer files that, upon information and belief, she continues to retain despite repeated requests for their immediate return. The nature of Defendants' conduct have left Plaintiffs with no choice but to seek affirmative judicial action and relief, including: (i) a declaration that Gatens' threatened claims have no factual and legal merit; (ii) damages for tortious interference with prospective business relations (iii) damages for tortious interference with contract; (iv) damages for defamation; (v) damages for breach of duty of loyalty as to Gatens; (vi) damages for intentional infliction of distress; and (vii) damages for conversion of College computer files.

3.      Plaintiff, CMSV, is a domestic, not-for-profit institution of higher education with its principal place of business in Riverdale, New York, offering undergraduate and graduate programs in liberal arts, including professional offerings in the fields of business, communication, education, and nursing.

4.      Founded in 1847, the College provides a values-oriented education rooted in its Catholic heritage and in the liberal arts tradition, and continues to uphold the mission of The Sisters of Charity of Saint Vincent de Paul of New York, a domestic not-for-profit organization. The College is proud to have been the first women's college in New York City. Its programs became coeducational in 1974.

5.      The College enjoys accreditations by the Board of Regents of the University of the State of New York, the Middle States Association of Colleges and Schools, the American Chemical Society, the National League of Nursing, Commission on Collegiate Nursing Education, and the Association of Collegiate Business Schools and Programs.

3

6.    Plaintiff Dr. Flynn is a citizen of the State of New York.   He has resided in Manhattan, New York County, at all times relevant hereto.  Dr. Flynn was appointed as President of the College in 2000.

7.    Dr. Flynn received his doctorate in history from Duke University.  He is a respected scholar and published author, and also serves on the Board of Directors of the Grace Institute, the Advisory Board of the Bronx Arts Ensemble, Skyline Conference (NCAA D-III), and the Lower Hudson Valley Catholic College and University Consortium.

8.    Under Dr. Flynn's leadership, contribution to the College's Annual Fund have increased, its endowment has grown and the College launched its most successful capital campaign, raising over $26 million. These funds have enabled the College to continue to offer a first-rate education, rooted in the Catholic tradition, to a growing number of diverse, highly-talented students.

9.    Dr. Flynn has never been the subject of any discrimination charge, proceeding or lawsuit.

10.    Upon information and belief, Defendant Gatens is a citizen of the State of New Jersey.  She has resided at 1154 Thornton Avenue, Plainfield, New Jersey 07060 at all times relevant hereto.

11.    Upon information and belief, Defendant Meade is a citizen of the Commonwealth of Massachusetts.  She has resided at 103 Elm Street, Apt. 2, Quincy, Massachusetts 02169 at all times relevant hereto.

12.    Upon information and belief, Defendant Trinidad-Enaye is a citizen of the State of New York.  She has resided at 514 Larchmont Acres, A, Larchmont, New York 20538 at all times relevant  hereto.

13.     Upon information and belief, Defendant Borrero-Large is citizen of the State of New York. She has resided at 224 Union Avenue, Peekskill, New York 10566 at all times relevant hereto.

14.     Upon information and belief, Does 1 through 4 are natural persons who, at all times material to this complaint, have acted as agents for and/or in concert with Gatens, Meade, Trinidad-Enaye, and/or Borrero-Large. Doe Defendants, through their respective acts and omissions on behalf of and/or in concert with Gatens, Meade, Trinidad-Enaye, and/or Borrero-Large caused and contributed to the injuries done to Plaintiffs.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332. The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Plaintiffs' state law claims (Claims 2-4, 6-7) because they derive from the same set of facts and circumstances as Plaintiffs' claims for declaratory relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. and pursuant to 28 U.S.C. §§ 2201, 2202 and/or for Breach of Fiduciary Duty. Personal jurisdiction vests over all Defendants based on their significant tortious conduct within this District and the State of New York, and over Defendants Trinidad-Enaye and Borrero-Large based on their physical residence in this District.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

17.     Defendant Gatens was involuntarily terminated from her employment as Vice President, Student Affairs/ Dean of Students, on March 19, 2008.

18.     Among other reasons, Gatens was terminated for her deceitful subterfuge in surreptitiously papering the personnel file of one of Gatens' personal friends and subordinate, Catherine Ingram ("Ingram"), former Director of Athletics, with lies about Ingram's performance and Dr. Flynn, in an effort to subvert and undermine the authority of her immediate supervisor, Dr. Flynn, in his capacity as President. Contrary to Gatens' statements in her memorandum, Dr. Flynn required Gatens to counsel Ingram on her performance; and it was Gatens' responsibility to communicate this with Ingram.

19.     Gatens' subversive plot was carried out in February 2008, just months after Dr. Flynn specifically directed Gatens to begin the process for terminating her friend and subordinate Ingram, who had been under-performing for some time and was unable to manage the Department of Athletics effectively.

20.     Dr. Flynn had numerous conversations with Gatens in which he expressed his mounting serious concerns about Ingram's inability to manage the Department of Athletics. In or about 2006, Dr. Flynn emphasized to Gatens that Ingram's continued employment was contingent on significant improvement. By Spring 2007, Dr. Flynn requested that Gatens meet regularly with the Director of Human Resources, William Bechman ("Bechman"), to track the improvement, if any, of Ingram's work performance. At no time did Gatens disagree that Ingram's job performance needed to improve. Indeed, she agreed she would counsel Ingram and agreed to coordinate with Bechman.

21.     As 2007 progressed, a number of Student-athletes expressed grave concern about the state of affairs for the College's athletics teams, which had been enduring an unusually high turnover rate of coaches under Ingram's leadership, and Gatens, despite the repeated requests of Bechman, refused to meet with him as directed by Dr. Flynn.

22.    Despite substantial objective criteria indicating Ingram's deteriorating performance, Gatens allowed her misguided personal feelings for Ingram to override the best interests of the College, the Department Athletics, its students, and student-athletes, and refused, in direct contravention of Dr. Flynn's instructions, to counsel Ingram and assist her to improve. By December 2007, Dr. Flynn unequivocally instructed Gatens to terminate Ingram no later than the end of Spring 2008 semester.

23.    Instead of carrying out Dr. Flynn's instruction to terminate Ingram, Gatens typed a nine-page memorandum dated February 26, 2008, "addressed" to Dr. Flynn. Pursuant to Gatens' scheme, however, the memorandum, by design, would never actually be delivered to Dr. Flynn, despite being ostensibly addressed to him. Instead, Gatens caused the memorandum to be hand-delivered to Bechman, with a note instructing Bechman to file the memorandum in Ingram's "personnel records".

24.    Gatens' reason for hiding the memorandum in Ingram's personnel records and away from Dr. Flynn's eyes was transparent: She believed that Ingram would eventually be terminated, and maliciously wanted to injure Dr. Flynn and the College by papering Ingram's personnel file with misrepresentations, mischaracterizations, and false data which praised Ingram's performance. Gatens admitted in her memorandum that she never counseled Ingram on her performance, in blatant disregard of Dr. Flynn's directives to do so, and with the knowledge that Ingram risked termination if her performance did not improve.

25.    Gatens, as an officer of the College, owed a fiduciary duty to the College and a duty of reporting honestly to Dr. Flynn. In dereliction of her duties, Gatens never told Dr. Flynn that she disagreed with his decision to terminate Ingram. Nor did Gatens ever inform Dr. Flynn that she had not counseled Ingram as he had instructed her to do. Instead, Gatens

intentionally created a false personnel record indicating in the memorandum, that was never delivered to Dr. Flynn, that Dr. Flynn's decision to terminate Ingram's employment placed the College at "legal risk" despite knowing Dr. Flynn's assessment of Ingram's job performance to be correct and her failure to counsel Ingram to improve her performance as she had been instructed to do.

26.    Upon information and belief, Gatens made Ingram aware of the contents of the memorandum intending to falsely support any legal challenges Ingram may assert arising out of her termination, and to induce Ingram to assert such legal challenges.

27.    Gatens' further false statements that Dr. Flynn's actions made the College "legally vulnerable" were intended to cause harm to Dr. Flynn and the College by falsely documenting that the decision to terminate Ingram was improper. Gatens' false statements were intended to place the personal interests of Gatens before the interests of the College and to provide a false excuse for her not counseling Ingram as she had been instructed to do.

28.    Dr. Flynn, upon learning of Gatens' misconduct, moved forward with the terminations of Gatens and Ingram concurrently on March 19, 2008. Nevertheless, in view of their long term relationships with the College and service to the students, Dr. Flynn immediately issued an announcement to the College community regarding their departures, respectfully highlighting and praising their past positive contributions.

29.    After being terminated for the aforesaid legitimate reasons, Gatens retained counsel who has sent a letter to the College threatening unfounded legal action and demanding a substantial monetary payment for frivolous claims that have no basis under any applicable law. Gatens, through her counsel, asserts frivolous and unspecified allegations of a sexually hostile work environment created by Dr. Flynn and violations of the College's "Whistleblower Policy"

with regard to her termination. In her desperation to assign a lascivious purpose to a simple gift given to her by Dr. Flynn, with which she adorned her desk for two years without complaint, Gatens now, post-termination, and never before, identifies a piece of ceramic fruit as offensive. In her letter, Gatens' counsel has advised that should Gatens' demands not be met, she would proceed directly to file charges of discrimination with the appropriate state and federal administrative agencies and "then file an action in federal court."

30.     Gatens' vague assertion of sexual harassment is belied by the fact that she was counseled by Dr. Flynn for her own inappropriate sexual conduct in the workplace, including jokes, innuendo and comments of a sexual nature which resulted in a complaint brought to Dr. Flynn by another female employee concerning Gatens' sexually inappropriate behavior.

31.     Further, Gatens' belated attempt to assert a violation under the College's Whistleblower Policy against Dr. Flynn is transparently false -- as it was asserted after she was terminated -- in her apparent retaliation against Dr. Flynn for her firing and as a cover for her own unethical and duplicitous behavior with regard to the Ingram memorandum. Although she claims that the College breached an implied in fact promise to her under the Whistleblower Policy, it is her own unclean hands that vitiate such an assertion.

32.     In addition, since being terminated, Gatens, along with Meade, Trinidad-Enaye, Borrero-Large, and others (identified herein as Does 1 through 4) (collectively "Defendants"), launched a well-concerted, ongoing smear campaign against Dr. Flynn with the specific intention of harming the College and Dr. Flynn's professional reputation, character, and integrity, and his relations with the College as well as the College's business relations with current and prospective students, teachers, employees, alumni, and financial donors.

33.     Gatens has defamed Dr. Flynn in his profession, particularly in the context of his being the President of an institution that serves to uphold the moral missions of the Sisters of Charity, by publishing a statement in an email dated March 29, 2008 to one of the College's current Vice Presidents that Dr. Flynn is "morally bankrupt" and a "misogynist."

34.     Meade, with Gatens' instruction and/or participation, disseminated a mass, defamatory email distribution on April 15, 2008 to an untold number of College alumni, students, and financial donors designed to malign Dr. Flynn's professional character, reputation, competence, and integrity, and his relations with the College, as well as the College's relations with current and prospective students, teachers, employees, alumni, and financial donors.

35.     In her April 15 email, Meade reported that she had met personally with Gatens over the previous weekend (April 12-13), confirming that Gatens was the source of her libelous and malicious misstatements of fact regarding Dr. Flynn.  Gatens and/or Meade made the following false statements with malice and/or a knowing, reckless disregard for the truth, including such statements as: "[Dr. Flynn] managed to go through 17 vice presidents in 8 years"; "[Dr. Flynn] has appointed mostly men to the higher positions at the college, positions that were previously female dominated";   "[Dr. Flynn] ended [CMSV's] affiliation with Manhattan College"; "[Dr. Flynn] built an athletic facility that he knew would be outdated before it even opened"; "[Dr. Flynn] has pretended to not have knowledge of various violations, including those shown on the news last year"; "[Dr. Flynn] made opening this past fall a residence life nightmare, including having an unfinished residence hall that first year students were moving in to"; "[Dr. Flynn] has told blatant lies about many of the employees of the college, and has now added Cathy and Adele to the list".

36.    The College, on April 18, 2008, sent letters to Gatens' counsel and to Meade requesting that they cease and desist their campaign of defaming Dr. Flynn and pressuring College alumni and donors to withhold further financial contributions to the College.

37.    Gatens' and Meade's campaign against Dr. Flynn and the College has culminated in numerous emails and letters from alumni to the College Board of Trustees and to Dr. Flynn, engendering further defamation of his character, and threatening to withhold financial support for the College.  One such email from an alumna sent on April 17, 2008 expressly stated: "Unless some recognition or restitution is made [to Gatens], I refuse to make any donation or other financial contribution to my alma mater in the future."  Another alumnus of the College emailed Dr. Flynn and the Chair of the Board of Trustees advising: "Alumni are threatening to withhold donations to the school until [Dr. Flynn] release[s] a statement explaining certain recent decisions. . . . Alumni can vote with their checkbooks, but students do not have this ability.  Decisions made by people who do vote (Alumni and other donors, trustees, and [Dr. Flynn], to name a few) impact the students."

38.    Indeed, the mechanisms of Gatens' and Meade' defamatory and intentionally harmful campaign are ongoing.  On the evening of April 22, 2008, the College Board of Trustees and Dr. Flynn sponsored a *Scholarship Tribute Dinner*, a black-tie reception and dinner at Cipriani's restaurant, New York City.  The *Scholarship Tribute Dinner* is one of the most crucial sources of scholarship funding for current and prospective students to be able to afford tuition at the College.

39.    Upon information and belief, Gatens and/or Meade maliciously interfered with this event and sent, under their direction, Trinidad-Enaye, Borrero-Large and other persons on their behalf to distribute placards which Gatens and/or Meade authored or contributed to that

contained false, defamatory statements about Dr. Flynn with the request that potential financial donors withhold their support due to Dr. Flynn. The placard, a true copy of which is attached hereto as Exhibit "A", addressed to: "Donors, Alumni, Trustees, Honorees and Guests of Tonight's Scholarship Tribute Dinner" repeated the false, defamatory statements in Meade's email. The placard states, "We just ask that when it comes time for you to donate to the College, be informed about what is happening."

40.     The defamatory publications of Gatens and/or Meade were further broadcasted in an April 24, 2008 article "Firings Agitate Mount Campus" published in *The Riverdale Press*. That article quoted Meade and repeated the false statements contained in the aforesaid April 15 email.

41.     On the day of Defendant Gatens' termination, Bechman instructed Gatens to immediately return the College's laptop computer that was issued to her (hereinafter the "laptop"), along with the College keys, cell phone, and credit card. Bechman specifically instructed Defendant Gatens to refrain from deleting any files from the laptop. On March 26, 2008, he instructed Defendant Gatens to return all College property.

42.     On or about March 29, Defendant Gatens returned the laptop and key.

43.     In or about April 2008, the College commenced an internal investigation into whether College property was missing from Defendant Gatens' former office. Shortly after this investigation commenced, Defendant Gatens sent an unsolicited email to the College's Vice President of Finance on April 25, stating that she had boxes in her attic that may contain College related information, and that she also had kept "thumb drives" containing College related information as to which she did not know the whereabouts.

44.    By letter of April 30, 2008, Plaintiffs' counsel issued a written request to Defendant Gatens' counsel, Judith Broach, Esq., that Gatens "return all property, materials, files, documents, and other items in her possession that belong to the College via federal express priority overnight no later than Friday, May 2." By email on May 1, 2008, Gatens' counsel acknowledged receipt of the April 30 letter, and requested the College to "please provide us with a list of any College property which you believe is in Ms. Gatens' possession." Plaintiffs' counsel responded by letter on May 1 that Ms. Gatens was the only person in the position to ascertain the description and quantity of College property that was in her possession and reiterated the demand for return of all College property.

45.    By letter of May 5, 2008, Gatens' counsel advised that "Ms. Gatens has conducted a search for any college documents, files and property in her possession. That search uncovered the enclosed files and thumb drive." Gatens' counsel's letter enclosed one redweld containing numerous College documents as well as one thumb drive containing over 7,000 of the College's computer files (hereinafter the "thumb drive").

46.    Upon information and belief, Gatens transferred the College's files to the thumb drive on May 2, 2008 from a computer or data storage device.

47.    Upon information and belief, the files transferred by Defendant Gatens on May 2, 2008 are a replica of substantial portions of the College's laptop computer used by Gatens, and returned to the College on March 29. The returned thumb drive did not even exist when Defendant Gatens sent her April 25 email to the College, and no other thumb drives have been returned. Gatens' counsel's May 5 letter makes no mention of the computer or data storage device from which Defendant Gatens transferred the College's files onto the thumb drive.

48.    The computer or data storage device from which the transfer of files was made on May 2, 2008 has not been returned despite the College's repeated written demands for the return of all of its property.

## FIRST CLAIM
### (Declaratory Judgment)

49.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 48 of this Complaint as if fully set forth at length herein.

50.    Because of Defendant Gatens' expressed intent to sue in federal court based on frivolous claims, and Defendants' active campaign to defame Dr. Flynn and tortiously interfere with his relations with the College and its relations with current and prospective students, employees, alumni, and donors, Plaintiffs filed this lawsuit.

51.    Gatens' threat of litigation and demands are baseless under any statutory law, the common law, or any other applicable law.

52.    The aforesaid reasons for the termination of Gatens' employment were legitimate and lawful.

53.    Accordingly, Plaintiffs request that the Court issue a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the Plaintiffs' decision to terminate Gatens was made for legitimate business reasons, was neither discriminatory nor retaliatory in nature, and did not violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law, § 290 *et seq.*, ("the State Human Rights Law"), and the New York City Human Rights Law, N.Y.C. Admin. Code, § 8-101 *et seq.* ("the City Human Rights Law"), or any other applicable law.

## SECOND CLAIM
### (Tortious Interference With Prospective Business Relations)

54.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 53 of this Complaint as if fully set forth at length herein.

55.    By their aforesaid misrepresentations, repeated and unjustified maligning of Dr. Flynn, Defendants have wrongfully and tortiously, with specific intent to damage and injure the College, interfered with the College and its Board of Trustees prospective business relations with current and prospective students, employees, alumni, and financial donors.

56.    By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Plaintiffs are entitled to declaratory and injunctive relief as well as compensatory and punitive damages in an amount to be determined at trial.

## THIRD CLAIM ON BEHALF OF PLAINTIFF DR. FLYNN
### (Defamation)

57.    Plaintiff Dr. Flynn repeats and realleges paragraphs 1 through 56, as though fully set forth herein.

58.    Defendants' aforesaid published statements of fact relating to Dr. Flynn are false.

59.    Defendants' aforesaid statements of fact are *per se* defamatory in that they tend to injure Dr. Flynn in his profession.

60.    Defendants' statements of fact are *per se* defamatory in that they impugn his morals, honesty, and integrity.

61.    Defendants' statements of fact were published in that they have been communicated to a third party.

62.    Defendants' knew that their statements of fact were false or were reckless or negligent as to the truth or falsity of their statements when made.

15

63.     Defendants conspired to, and did intentionally make the statements of fact with malice, spite and/or ill- will toward Dr. Flynn.

64.     As a consequence of the publication of Defendants' false statements, Dr. Flynn has suffered damages, and will continue to suffer damages, including but not limited to damage to his professional reputation

65.     By reasons of the foregoing, Defendants are liable to Dr. Flynn, in an amount to be determined by the Court, together with costs and interest, as allowable by law.

## FOURTH CLAIM
### (Tortious Interference With Contract)

66.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 65 of this Complaint as if fully set forth at length herein.

67.     By their aforesaid misrepresentations, repeated and unjustified maligning of Dr. Flynn, Defendants have wrongfully and tortiously, with specific intent to damage and injure Dr. Flynn and/or the College, interfered with Dr. Flynn's contract of employment with the College and/or the College's Board of Trustees intending to cause interference with, a breach of and/or non-performance of said contract.

68.     By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Plaintiffs are entitled to declaratory and injunctive relief as well as compensatory and punitive damages in an amount to be determined at trial.

## FIFTH CLAIM
### (Breach of Fiduciary Duty Against Gatens)

69.     Plaintiffs repeat and reallege paragraphs 1 through 68, as though fully set forth herein.

70.     By virtue of her prior position as the College's Dean of Students, Defendant Gatens had been entrusted with a fiduciary duty to the College, its employees, its Board of

16

Trustees, and its current and prospective students and alumni, which survived her termination, to refrain from taking action that undermines the financial livelihood of the College.

71.    Defendant Gatens has intentionally, maliciously and without justification breached her fiduciary duties to the College by, inter alia, deliberately failing to counsel and assist Ingram in improving her performance, subverting the President's authority, creating a false personnel record, engaging in the aforesaid tortious interference with the College's prospective relations with current and prospective students, employees, alumni, and financial donors, and wrongfully converting College computer files.

72.    By reason of the foregoing, the College is entitled to compensatory damages in an amount to be determined at trial but no less than the amount of any salary and other compensation including benefits Defendant Gatens received from the College during the period of disloyalty.

73.    In addition, as a result of Plaintiff's breach of fiduciary duty and loyalty, Defendant Gatens has forfeited any claims for additional remuneration of any kind from the College.

## SIXTH CLAIM ON BEHALF OF PLAINTIFF DR. FLYNN
### (Intentional Infliction of Emotional Distress)

74.    Plaintiff Dr. Flynn repeats and realleges each and every allegation set forth in Paragraphs 1 through 73 of this Complaint as if fully set forth at length herein.

75.    Defendants' conduct that is described in the foregoing paragraphs constitutes extreme and outrageous conduct and behavior.

76.    Defendants perpetrated this conduct with malice, and with the intent to cause severe emotional distress to Dr. Flynn and/or in deliberate disregard of the high probability that severe emotional distress to Dr. Flynn would result.

77.    Defendants have maliciously embarked on a course of conduct intended to cause Dr. Flynn to suffer mental and emotional distress, tension and anxiety.

78.    Plaintiff Dr. Flynn has suffered damage to his personal and business reputation and standing, has been placed under undue strain and burdens, and forced to endure extreme embarrassment. He has suffered and will continue to suffer great mental strain and anguish and severe emotional distress.

79.    By reason of the foregoing and as a direct and proximate result of Defendants' conduct, Plaintiff Dr. Flynn is entitled to compensatory and punitive damages against Defendants in an amount to be determined at trial.

## SEVENTH CLAIM
### (*Prima Facie* Tort)

80.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 79 of this Complaint as if fully set forth at length herein.

81.    Defendants' conduct was completely unjustified and was intended to inflict substantial harm against Plaintiffs.

82.    By reason of the foregoing, Plaintiffs are entitled to declaratory and injunctive relief as well as compensatory and punitive damages in an amount to be determined at trial.

## EIGHTH CLAIM ON BEHALF OF PLAINTIFF CMSV
### (Conversion Against Gatens)

83.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 82 of this Complaint as if fully set forth at length herein.

84.    By her conduct, Defendant Gatens has, upon information and belief, exercised an unauthorized ownership, dominion and/or control over the College's property.

85.    Despite the College's repeated requests for return of its property, Defendant Gatens, upon information and belief, continues to exercise an unauthorized ownership, dominion and/or control over the College's property.

86.    By Defendant Gatens' aforesaid conduct, Plaintiff CMSV has been wrongfully excluded from the exercise of its rights over its property which, upon information and belief, remains in Defendants' exclusive possession and/or control.

87.    By reason of the foregoing, and as a direct and proximate result of Defendant Gatens' conversion, Plaintiff CMSV is entitled to declaratory and injunctive relief as well as compensatory and punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and against Gatens as follows:

a.    Declaring that the decision to terminate Gatens was neither discriminatory nor retaliatory in nature, and does not violate Title VII, the State Human Rights Law, the City Human Rights Law or any other applicable law;

b.    Declaring that Plaintiffs have no liability to Gatens under Title VII, the State Human Rights Law, the City Human Rights Law or any other applicable law

c.    Enjoining and permanently restraining these violations;

d.    Directing Defendants to pay compensatory and punitive damages to Plaintiffs in an amount to be proven at trial

e.    Disgorgement and return of all salary and other compensation and benefits paid by the College during the period of Defendant Gatens' disloyalty;

f.    Awarding Plaintiffs costs, disbursements and reasonable attorneys' fees; and

g.    Awarding Plaintiffs such other and further relief that the Court deems just and appropriate.

Dated: New York, New York
       May 9, 2008

Respectfully submitted,

EPSTEIN BECKER GREEN, P.C.

By: _____
    Frances M. Green (FG-8035)
    fgreen@ebglaw.com
    Brian G. Cesaratto (BC-5464)
    bcesaratto@ebglaw.com
    Brian M. Molinari (BM-7836)
    bmolinari@ebglaw.com
    250 Park Avenue
    New York, New York  10177-1211
    (212) 351-4500
    Attorneys for Plaintiffs

Exhibit A

### Donors, Alumni, Trustees, Honorees and Guests of Tonight's Scholarship Tribute Dinner

As Alumni of the College we thought it would be in our best interest to share with you some information about what has been going on recently at the College of Mount Saint Vincent.

> ➤ Mastronardi Hall, the newest Residence Hall, opened up last Fall (2007) and because it was not finished on time it was not properly inspected before opening. As a result, there were serious drainage issues, which caused flooding and major mold growth in the bathrooms.

> ➤ The company that was used in the building of Mastronardi Hall is now the same company the College is using to build the extension to the gymnasium, which will actually be outdated before construction even begins.

> ➤ There has been speculation over the recent firings of two Mount Saint Vincent Administrators who had put over 20 years each into service at the College and were let go mid semester, during a vacation, without being given the opportunity to say goodbye to co-workers, students, or the college they have loved passionately.

> ➤ There has also been speculation over the numerous Administrative changes made under the current President. In his tenure at the College there have been at least 17 different Vice Presidents working under him.

> ➤ There has been speculation that Dr. Flynn did in fact have knowledge of the numerous fire violations broadcasted on WABC-NY last year.

**We just ask that when it comes time for you to donate to the College, be informed about what is happening! We all love and cherish this school, our alma mater, but we also want to make sure its mission is being upheld.**